Slip Op. 20-140

## UNITED STATES COURT OF INTERNATIONAL TRADE

ECHJAY FORGINGS PRIVATE LIMITED,

　　　　　Plaintiff,

v.

THE UNITED STATES,

　　　　　Defendant,

　　and

COALITION OF AMERICAN FLANGE
PRODUCERS,

　　　　　Defendant-Intervenor.

Before: Gary S. Katzmann, Judge
Court No. 18-00230

*PUBLIC VERSION*

## OPINION

[The court remands Commerce's Final Determination for further explanation.]

Dated: October 8, 2020

Peter J. Koenig, Squire Patton Boggs (US) LLP, of Washington, DC, argued for plaintiff. With him on the brief was Wojciech Maciejewski.

Geoffrey M. Long, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of Counsel Daniel J. Calhoun, Assistant Chief Counsel, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Cynthia C. Galvez, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor. With her on the brief were Daniel B. Pickard and Stephanie M. Bell.

Katzmann, Judge: "All happy families are alike; each unhappy family is unhappy in its own way," so opens the classic, intense novel, <u>Anna Karenina</u>.[1]  What can be said of the Doshi family?  Their saga is central to the case now before the court.

In assessing antidumping ("AD") duties on foreign producers who sell goods in the American market at below reasonable fair market value in violation of domestic trade laws, where appropriate, the United States Department of Commerce ("Commerce") is authorized by statute and regulation to "collapse" multiple entities into a single entity to reflect their market relationship. This case involves issues of collapsing affiliated entities exclusively owned by members of the same, albeit estranged, family -- the Doshi family.  All of the companies produce or have produced in the past merchandise subject to Commerce's AD investigation.  Commerce collapsed the entities, concluding they were affiliated, would not require substantial retooling of their facilities to restructure production priorities, and had a significant potential to manipulate price or production.  <u>Stainless Steel Flanges From India: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstance Determination</u>, 83 Fed. Reg. 40,745 (Dep't Commerce Aug. 16, 2018), P.R. 411 ("<u>Final Determination</u>").

Plaintiff Echjay Forgings Private Limited ("Echjay"), an India-based stainless steel flanges producer, brought an action against the United States ("Government") to challenge Commerce's decision to collapse Echjay with three other companies into a single entity for the purposes of its <u>Final Determination</u>.  Defendant-Intervenor Coalition of American Flange Producers ("Coalition") joins the Government in support of Commerce's decision.  Mot. to Intervene as Def.-Inter., Dec. 19, 2018, ECF No. 10; Ct. Order Granting Mot., Dec. 20, 2018, ECF No. 14.  The court concludes that Commerce's collapsing determination was not adequately explained based on the record

---

[1] Leo Tolstoy, <u>Anna Karenina</u> (1877).

evidence. Accordingly, the case is remanded to Commerce for further proceedings consistent with

this opinion.

## BACKGROUND

### I.      *Legal and Regulatory Framework*

Dumping occurs when a foreign company sells goods in the United States at a lower price

than the company charges for the same product in its home market. Sioux Honey Ass'n v. Hartford

Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012). This practice constitutes unfair competition

because it permits foreign producers to undercut domestic companies by selling products below

reasonable fair market value. Id. at 1046–47. To address the harmful impact of such unfair

competition, Congress enacted the Tariff Act of 1930, as amended,[2] which empowers Commerce

to investigate potential dumping and, if necessary, to issue orders instituting duties on subject

merchandise. Id. Pursuant to 19 U.S.C. § 1673, Commerce imposes AD duties on foreign goods

if they are being or are likely to be sold in the United States at less than fair value and the

International Trade Commission determines that the sale of the merchandise at less than fair value

materially injures, threatens, or impedes the establishment of an industry in the United States. See

also Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017);

Shandong Rongxin Imp. & Exp. Co. v. United States, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394

(2018). "Sales at less than fair value are those sales for which the 'normal value' (the price a

producer charges in its home market) exceeds the 'export price' (the price of the product in the

United States)." Apex Frozen Foods v. United States, 862 F.3d 1322, 1326 (Fed. Cir. 2017)

(quoting Union Steel v. United States, 713 F.3d 1101, 1103 (Fed. Cir. 2013)). The amount of the

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title
19 of the U.S. Code, 2018 edition.

AD duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673; see also Shandong Rongxin, 331 F. Supp. 3d at 1394.

"In some instances, Commerce will treat related entities as a single entity for purposes of [AD] calculations." Prosperity Tieh Enter. Co. v. United States, 965 F.3d 1320, 1323 (Fed Cir. 2020) (citing Carpenter Tech. Corp. v. United States, 510 F.3d 1370, 1373 (Fed. Cir. 2007)). "The purpose of collapsing multiple entities into a single entity is to prevent affiliated entities from circumventing [AD] duties by 'channel[ing] production of subject merchandise through the affiliate with the lowest potential dumping margin.'" Prosperity Tieh, 965 F.3d at 1323 (quoting Slater Steels Corp. v. United States, 27 CIT 1255, 1261, 279 F. Supp. 2d 1370, 1376 (2003) ("Slater Steels I")). Although the AD duty statute does not directly address collapsing, "Commerce's collapsing practice is a permissible construction of the statute, and thus in accordance with the law." Koenig & Bauer-Albert AG v. United States, 24 CIT 157, 159–60, 90 F. Supp. 2d 1284, 1287–88. See also id. at 1277–78; Hontex Enters., Inc. v. United States, 27 CIT 272, 289–90, 248 F. Supp. 2d 1323, 1338 (2003) ("Hontex Enters. I") (noting that Commerce's collapsing practice, as specified in its regulations, has been upheld as a reasonable interpretation of the AD statute). The principal regulation promulgated by Commerce governing collapsing of companies, 19 C.F.R. § 351.401(f), provides:

> (1) In general. In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.
>
> (2) Significant potential for manipulation. In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:

     (i) The level of common ownership;

     (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

     (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f) (2019).  See also Prosperity Tieh, 965 F.3d at 1323 ("Commerce's practice of collapsing entities is governed by 19 C.F.R. § 351.401(f)").

     Under Section 351.401(f), three requirements must be satisfied in order for Commerce to collapse entities:  Commerce must determine that (1) the companies are affiliated, (2) they share "production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities," and (3) there is "a significant potential for the manipulation of price or production" between the affiliated companies.  Carpenter Tech. Corp., 510 F.3d at 1373.  See also Prosperity Tieh, 965 F.3d at 1323; Dongkuk Steel Mill Co. v. United States, 29 CIT 724, 733, 27 ITRD 1890 (2005).  In determining whether to collapse entities, Commerce looks for "relatively unusual situations, where the type and degree of relationship is so significant that [it finds] there is a strong possibility of price manipulation." Koyo Seiko Co. v. United States, 31 CIT 1512, 1535, 516 F. Supp. 2d 1323, 1346 (2007) aff'd, 551 F.3d 1286 (Fed. Cir. 2008) ("Koyo Seiko II") (quoting Nihon Cement Co. v. United States, 17 CIT 400, 426–27, 15 ITRD 1558 (1993)).

       *A.*    *Affiliation*

     With respect to the first condition for collapsing, that the producers must be "affiliated," that term is set forth in 19 U.S.C § 1677(33), codifying the Tariff Act of 1930 as amended by the

Uruguay Round Agreements Act ("URAA").[3]  Subsections (A), (F), and (G) of that statute are

relevant to this dispute:

> The following persons shall be considered to be ''affiliated'' or ''affiliated persons'':
>
> (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
>  . . .
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
>
> (G) Any person who controls any other person and such other person.
>
> For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

19 U.S.C § 1677(33) (2018).

The Statement of Administrative Action ("SAA") accompanying the URAA clarifies the

purpose of affiliation as to family members.

> The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm "operationally in a position to exercise restraint or direction" over another in the absence of an equity relationship.  A company may be in a position to exercise restraint or direction for example, through corporate or family groupings, franchise or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other.

Uruguay Round Agreements Act, Statement of Administrative Action, accompanying H.R. 103–

5110 at 838 (1994), reprinted in 1994 U.S.C.C.A.N. 3773.[4]

---

[3] The statute does not address the consequences of finding entities affiliated in terms of calculating the dumping margin.  Jinko Solar Co. v. United States, 41 CIT __, __, 229 F. Supp. 3d 1333, 1344 (2017).

[4] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

Commerce's regulation, 19 C.F.R. § 351.102(b)(3), adopts the definition of "affiliated" and "affiliated persons" set forth in 19 U.S.C § 1677(33).  The regulation further clarifies "affiliated persons" with reference to the statutory definition.

> Affiliated persons; affiliated parties. ''Affiliated persons'' and ''affiliated parties'' have the same meaning as in section 771(33) of the Act [19 U.S.C § 1677(33)].  In determining whether control over another person exists, within the meaning of section 771(33) of the Act, the Secretary will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.

19 C.F.R. § 351.102(b)(3).  Commerce further defines "person" as "any interested party as well as any other individual, enterprise, or entity, as appropriate."  19 C.F.R. § 351.102(b)(37).

### B.        *"No substantial retooling" Requirement*

To collapse entities pursuant to Section 351.401(f), Commerce must additionally find the collapsed "producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities."  19 C.F.R. § 351.401(f).  This factor "requires similarity in the products produced, not in the facilities that produced them."  Viraj Group v. United States, 476 F.3d 1349, 1356 (Fed. Cir. 2007).  Commerce may look to the cost of retooling in determining whether retooling would be substantial.  See, e.g., id. at 1358–59 (affirming Commerce's finding that the retooling would not be substantial based on the cost of retooling in relation to the company's historical capital expenditure and financial resources); Slater Steels Corp. v. United States, 28 CIT 340, 350–51, 316 F. Supp. 2d 1368, 1378–79 (2004) ("Slater Steels II") (holding that a given cost of retooling, as a proportion of a company's fixed asset value, would not on its own qualify as substantial).  The Federal Circuit has held that companies may satisfy the "no substantial retooling" requirement when they do not

possess production facilities themselves but use the same subcontractor's facilities and the

subcontracted production would also enable the collapsed companies to shift production quantities

among themselves.  Carpenter Tech. Corp., 510 F.3d at 1373–74.  Commerce may also collapse

non-producers, such as exporters, following Section 351.401(f) to the extent that the regulations

are applicable.  See Hontex Enters. I, 248 F. Supp. 2d at 1342–43.

### C.    *Potential for Manipulation*

Finally, to determine whether the third collapsing requirement under Section 351.401(f),

has been met -- that there be "a significant potential for the manipulation of price or production,"

Commerce "may consider" the following factors enumerated in Section 351.401(f)(2): "(i) the

level of common ownership; (ii) the extent to which managerial employees or board members of

one company sit on the board of director for an affiliated company; (iii) whether operations are

intertwined."  Prosperity Tieh, 965 F.3d at 1323 (citing 19 C.F.R. § 351.401(f)(2)).  No one factor

alone is dispositive, but Commerce must consider these factors in light of the totality of the

circumstances.  Id.; Zhaoqing New Zhongya Aluminum Co. v. United States, 39 CIT __, __, 70 F.

Supp. 3d. 1298, 1306 (2015); Koyo Seiko II, 31 CIT at 1535, 516 F. Supp. 2d at 1346.   In

evaluating the potential for manipulation, Commerce considers both actual manipulation in the

past and possibility of future manipulation.  Antidumping Duties; Countervailing Duties, 62 Fed.

Reg. 27,296, 27,346 (Dep't Commerce May 19, 1997) ("Preamble").

### II.    *Facts and Procedural History of the Case*

### A.    *Commerce's Investigation into the Doshi Companies*

On September 11, 2017, Commerce initiated an AD duty investigation of stainless steel

flanges (the "subject merchandise") imported from India and China, upon the petition by Coalition.

Stainless Steel Flanges From India and the People's Republic of China: Initiation of Less-Than-

Fair-Value Investigation, 82 Fed. Reg. 42,649 (Dep't Commerce Sept. 11, 2017), P.R. 18.  The

period of investigation ("POI") was July 1, 2016 through June 30, 2017.  Id. at 42,649.  Commerce

selected Echjay as one of the mandatory respondents[5] to the investigation and issued Echjay a

questionnaire.  Mem. from C. Canales to E. Yang, re: Respondent Selection (Dep't Commerce

Oct. 3, 2017), P.R. 29.  Commerce requested information on certain companies with regards to

their affiliation with Echjay: Echjay Industries Private Limited ("Echjay Industries"), Echjay

Forging Industries Private Limited ("EFIPL"), and Spire Industries Private Limited ("Spire")

(together with Echjay, the "Doshi Companies").  See id.

In its response to Commerce, Echjay explained that all Doshi Companies are owned by

members of the same Doshi family but that it was not affiliated with any of the other Doshi

---

[5] In CVD investigations or administrative reviews, Commerce may select mandatory respondents
pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine
> individual countervailable subsidy rates under paragraph (1) because of the large
> number of exporters or producers involved in the investigation or review, the
> administering authority may --
>
>> (A) determine individual countervailable subsidy rates for a reasonable
>> number of exporters or producers by limiting its examination to --
>>
>>> (i) a sample of exporters or producers that the administering
>>> authority determines is statistically valid based on the information
>>> available to the administering authority at the time of selection, or
>>>
>>> (ii) exporters and producers accounting for the largest volume of the
>>> subject merchandise from the exporting country that the
>>> administering authority determines can be reasonably examined; or
>>
>> (B) determine a single country-wide subsidy rate to be applied to all
>> exporters and producers.

The individual countervailable subsidy rates determined under subparagraph (A) shall be used to
determine the all-others rate under section 1671d(c)(5) of this title.

Companies due to past and ongoing family partitions.  Letter from Echjay to Sec'y of Commerce,

re: Echjay's Resp. to Sec. A of Original AD Duty Questionnaire at 8–10 (Oct. 31, 2017), C.R. 14–

23, P.R. 47–55 ("Echjay Questionnaire Resp.").  The following summarizes Echjay's contentions

regarding the Doshi family divisions:  Prior to 1983, the Doshi family owned Echjay Industries

which had two manufacturing units in India.  Letter from Echjay to Sec'y of Commerce, re:

Echjay's Resp. to 2nd Suppl. Sec. A AD Duty Questionnaire at 5–6, P.R. 120–131 ("Echjay's

Suppl. Questionnaire Resp.").  In 1983, a family partition and legal separation agreement divided

the two manufacturing units, with Echjay Industries retaining one facility and Echjay being created

to retain another.  Id. at 6.  Since the 1983 partition, Echjay has been owned and managed by the

Sarvadaman Doshi family.  Id. at 6–8.  This legal separation ended all common ownership, and

the two companies became "full-fledged competitor[s]."  Echjay Questionnaire Resp. at 8.  Echjay

later acquired a second manufacturing unit.  Id. at 9.  A second family partition then occurred

within the Sarvadaman Doshi family in [[         ]].  Id.  At that time, Sarvadaman Doshi's brothers,

Deepak Doshi and Nagin Doshi, created EFIPL and retained one manufacturing unit from Echjay.

Id.  At the time of the separation, an interim legal order was put into place to bar interference of

the Sarvadaman Doshi family and the Deepak Doshi family in their respective companies.  Id.

After that separation, the Deepak Doshi family also created Spire, in which the Sarvadaman Doshi

family has never had ownership or participation.  Id. at 11.  Legal agreements, finalized by the

Bombay High Court in [[                  ]], retroactively separated Echjay from EFIPL, and

members of the family group controlling EFIPL resigned from directorship of Echjay [[      ]]

to eliminate sharing of managerial employees.  Id. at 9–10.  Shares held in each other's company

were "still pending to be transferred" but, per the legal agreements, neither family could control,

intervene in the operations, or hold the shares on behalf of each other.  Id. at 10.

Thus, by the time of the POI and Commerce's investigation, the Doshi family fractured into three camps -- the original Doshi family owning Echjay Industries, the Sarvadaman Doshi family owning Echjay, and the Deepak Doshi family owning EFIPL and Spire. Echjay acknowledged that Echjay Industries may have exported subject merchandise during the POI. Id. at 8. However, as Echjay reported, EFIPL and Spire both ceased production of subject merchandise years prior to the POI. Id. at 10–11. Neither EFIPL nor Spire produced or sold subject merchandise during the POI. Id. Echjay reported that it had no supply of input, sharing of facilities, or other instances of intertwined operations with other Doshi Companies; Echjay functioned independently. Id. at 8–12.

Based on this response, Commerce requested additional information from Echjay, including supporting documentation on production of subject merchandise of Echjay Industries, EFIPL, and Spire. Letter from C. Canales to Echjay, re: Commerce Suppl. Questionnaire to Echjay at 7 (Dep't Commerce Nov. 27, 2017), P.R. 91. Commerce also asked Echjay to address that Spire's website indicated that it produced forged products and flanges, contrary to Echjay's assertions. Id. In its response, Echjay reviewed the history of the Doshi family and the Doshi Companies, laying out three separate family groups owning and controlling the Doshi Companies. Echjay's Suppl. Questionnaire Resp. at 5–8. Echjay also highlighted for each partition the family agreements and court-approved scheme of arrangements. Id. Echjay stated that it had limited information of other Doshi Companies due to the "hostile separation" and specified its efforts in collecting certain organizational information Commerce required. Id. at 8–9. With regard to status of production, Echjay restated that EFIPL and Spire had already closed down their plants and had disposed, or were disposing, of the equipment for the production of subject merchandise. Id. at 13–15. Echjay included the closure letter of EFIPL's plant as well as photographs and projected

design showing the construction of a residential complex at the plant's location.  Id. at 13–14.

Echjay also provided Spire's audited financials, a letter from Spire, and [[

]], suggesting that Spire's plant was dysfunctional and [[

]].  Id. at 14–15, 22.  Echjay further claimed that Spire was in the process of updating

its website to reflect the change.  Id. at 15, 30.  Echjay noted that, according to a letter from Echjay

Industries, it exported "very small quantities" of subject merchandise to the United States prior to

but none during the POI.  Id. at 12.

### B.    *Commerce's Determination*

Commerce published its preliminary determination on March 28, 2018, finding Echjay

affiliated with the rest of the Doshi Companies and collapsing them into a single entity for the AD

investigation.  See Stainless Steel Flanges From India: Preliminary Affirmative Determination of

Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances,

Postponement of Final Determination, and Extension of Provisional Measures, 83 Fed. Reg.

13,246 (Dep't Commerce Mar. 28, 2018), P.R. 339 ("Preliminary Determination"); Mem. from J.

Maeder to G. Taverman, re: Decision Mem. for the Preliminary Determination in the Less-Than-

Fair-Value Investigation of Stainless Steel Flanges from India at 9, (Dep't Commerce Mar. 19,

2018), P.R. 327 ("PDM"); Mem. from J. Hancock to J. Doyle, re: Affiliation Mem. of Echjay,

Echjay Industries, EFIPL, and Spire (Dep't Commerce Mar. 19, 2018), C.R. 339–41, P.R. 346

("Preliminary Affiliation Memo").  Commerce collapsed the Doshi Companies because it found

that they were affiliated through common ownership by the Doshi family, had similar production

facilities that would not require substantial retooling to shift manufacturing priorities, and had a

significant potential for manipulation of prices or production.  Preliminary Affiliation Memo at 9–

13.

Echjay challenged Commerce's determination to collapse it with each of the other Doshi Companies in its case brief.  Letter from Echjay to Sec'y of Commerce, re: Stainless Steel Flanges from India; Echjay Case Br. (May 25, 2018), P.R. 393 ("Echjay Case Br.").  Nevertheless, Commerce maintained its decision to collapse the entities for the purposes of its AD investigation in its <u>Final Determination</u>.  83 Fed. Reg. at 40,746; Mem. from J. Doyle to J. Maeder, re: Issues and Decision Mem. for the Final Determination of the AD Duty Investigation of Stainless Steel Flanges from India at 14–27 (Dep't Commerce Aug. 10, 2018), P.R. 406 ("IDM").

Echjay initiated this litigation on November 8, 2018 and filed a complaint on December 8, 2018.  Summons, ECF No. 1; Compl., ECF No. 7.  Echjay challenges Commerce's decision to collapse the Doshi Companies in its <u>Final Determination</u> as not supported by substantial evidence or otherwise in accordance with law.  Echjay Opening Br., June 25, 2019, ECF No. 26 ("Pl.'s Br.").  The Government and Coalition respond that the <u>Final Determination</u> should be affirmed. Def.'s Resp. to Pl.'s Mot. for J. on the Agency R., Sept. 23, 2019, ECF No. 30 ("Def.'s Br."); Resp. Br. of Def.-Inter., Sept. 23, 2019, ECF No. 33 ("Def.-Inter.'s Br.").  Echjay replied on November 12, 2019.  Pl. Echjay Reply to Opp'n Br., ECF No. 36 ("Pl.'s Reply).  The parties provided written responses to the court's questions in advance of oral argument.  Ct.'s Letter re: Questions for Oral Arg., June 11, 2020, ECF No. 50; Ct.'s Letter re: Suppl. Questions for Oral Arg., June 17, 2020, ECF No. 54; Pl.'s Resp. to the Ct.'s Questions, June 22, 2020, ECF No. 59;; Def.'s Resps. to the Ct.'s Questions in Advance of Oral Arg., June 24, 2020, ECF No. 63; Def.-Inter.'s Resp. to Ct.'s Questions for Oral Arg., June 23, 2020, ECF No. 62.  Oral argument was held on July 13, 2020.  ECF No. 64.  The parties then filed post-argument submissions on July 16, 2020.  Echjay Further Comments, ECF No. 67; Def.-Inter.'s Subm'n of Suppl. Comments, ECF No. 66.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iv), (vi).   The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."   In reviewing for substantial evidence, the court "must do more than create a suspicion of the existence of the fact to be established," N.L.R.B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939), and search for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938).  "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

## DISCUSSION

Echjay challenges Commerce's decision to collapse the Doshi Companies on four bases -- on each of the three collapsing prongs and as inconsistent with other Commerce determinations. First, Echjay contends that Commerce wrongly interpreted the statute governing affiliation, 19 U.S.C. § 1677(33), to find companies owned by different individuals in a family affiliated.  Pl.'s Br. at 5.  Echjay also contends that substantial evidence does not support the determination that the Doshi family was "a person" under Section 1677(33) and thus that the Doshi Companies were affiliated.  Id. at 10.  Second, Echjay argues that two of the Doshi Companies -- EFIPL and Spire -- do not have relevant production facilities and thus would require substantial retooling contrary to Commerce's finding.  Id. at 24–28.  Third, Echjay states that it has no common ownership,

common managerial employees, or intertwined operations with other Doshi Companies, and therefore there is no potential for manipulation. Pl.'s Br. at 32–33. Lastly, Echjay argues that Commerce's decision to collapse is unlawfully inconsistent with a prior AD determination and the countervailing duty ("CVD") determination concurrent with the AD determination at issue here. Pl.'s Br. at 30–32, 33.

While the court holds that Commerce's interpretation of the affiliation statute was permissible, the court concludes that Commerce did not determine the Doshi family to be a "person" under Section 1677(33)(F) based on substantial evidence. Further, the court concludes that Commerce did not find Echjay, EFIPL, and Spire could shift manufacturing priorities without substantial retooling of the production facilities based on substantial evidence. With respect to the third prong of the collapsing analysis, the court determines that Commerce did not find a "potential for manipulation" based on substantial evidence. Lastly, the court concludes that Commerce did not explain the apparent inconsistency between its determination to collapse Echjay and Echjay Industries in the Final Determination with its contrary decision in its prior AD determination. Therefore, the court remands to Commerce its decision to collapse Echjay with the Doshi Companies in its Final Determination for further explanation of its collapsing determination based on substantial record evidence.

I.    ***Commerce's Decision to Find The Doshi Companies Affiliated Through the Doshi Family Grouping Was Based on a Permissible Statutory Interpretation, But Unsupported By Substantial Evidence.***

In analyzing the first collapsing prong, Commerce found the Doshi Companies to be affiliated "pursuant to § 771(33)(A) and (F) of the Act," referring to 19 U.S.C. § 1677(33)(A) and (F). Preliminary Affiliation Memo at 4; IDM at 18. Citing to the SAA, Ferro Union v. United States, 23 CIT 178, 193, 44 F. Supp. 2d 1310, 1325 (1999), and agency practice in other cases,

Commerce concluded that "person" in § 1677(33)(F) can be interpreted to encompass a "family."

PDM at 7; IDM at 20.  Based on the submission of Echjay, Commerce summarized the evidence

that, in relation to Sarvadaman Doshi, Chairman and Managing Director for Echjay, his uncle

owned Echjay Industries, his brother Deepak Doshi owned EFIPL, and his brother Nagin Doshi

owned Spire.  Preliminary Affiliation Memo at 4.  Commerce thus found the owners of the Doshi

Companies to be to be members of the same family group and thus "affiliated family members"

pursuant to Section 1677(33)(A).  Id. at 4.  Commerce then found the Doshi family a "person" as

the only shareholders and senior managers of the Doshi Companies and with control over the major

decisions of the Doshi Companies under Section 1677(33)(F).  Id. at 4–6.  In this way, Commerce

found the Doshi Companies to be affiliated as under common control by the Doshi family.

### A.    Commerce Properly Interpreted Section 1677(33)(F) to Include a Family as a "Person" For Purposes of Affiliation.

Echjay first challenges Commerce's interpretation of Section 1677(33)(F).  Pl.'s Br. at 4–

20.  Echjay contends that a family grouping is not "a person" within the meaning of Section

1677(33)(F).  Pl.'s Br. at 5.  Rather, Echjay contends that the common meaning of the word "family

grouping" suggests that it is "a group of persons."  Id.  Echjay argues that there is no reason for

Commerce to interpret the singular "person" in Section 1677(33) in the plural to facilitate statutory

intent.  Id. at 5–6 (citing First Nat'l Bank in St. Louis v. Missouri, 263 U.S. 640, 657 (1924)).

Treating a family as a person under Section 1677(33)(F), Echjay further argues, would leave

redundant Section 1677(33)(A) that provides for affiliation among family members.  Id. at 6–8.

The Government counters that Commerce reasonably interpreted the language of

Section 1677(33)(F) through Commerce's regulation, 19 C.F.R. § 351.102(b)(37), which defines

"person" as including "any interested party as well as any other individual, enterprise, or entity, as

appropriate."  Def.'s Br. at 7, 10–11.  The Government notes that the court previously upheld this

interpretation and that Commerce has made similar findings based on this interpretation in other

determinations.  Def.'s Br. at 11–12 (citing Ferro Union, 44 F. Supp. 2d at 1324, 1326; Certain

Crystalline Silicon Photovoltaic Products from the People's Republic of China, 79 Fed. Reg.

76,970 (Dep't Commerce Dec. 23, 2014): Aluminum Extrusions from the People's Republic of

China, 76 Fed. Reg. 18,524 (Dep't Commerce Apr. 4, 2011)).  Coalition makes similar arguments

to rebut Echjay's claims.  See Def.-Inter.'s Br. at 12–13.

 The court concludes that Commerce's interpretation of the statute to include treating a

family as an entity or an enterprise and thus a "person" is a permissible interpretation.  In reviewing

Commerce's interpretation of statutes, the court must apply the two-step test laid out in Chevron,

U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  See also Apex

Frozen Foods Priv. Ltd., 862 F.3d at 1329.  Under Chevron, the court first asks "whether Congress

has directly spoken to the precise question at issue." 467 U.S. at 842.  If yes, "that is the end of the

matter," and the court "must give effect to the unambiguously expressed intent of Congress."  Id.

at 842–43.  However, "if the statute is silent or ambiguous with respect to the specific issue, the

question for the court is whether the agency's answer is based on a permissible construction of the

statute."  Id. at 843.  Deference to the agency's interpretation of a statute is only required by

Chevron when that interpretation is reasonable.  Koyo Seiko Co. v. United States, 36 F.3d 1565,

1573 (Fed. Cir. 1994) ("Koyo Seiko I").  Section 1677(33)(A) specifies that "[m]embers of a

family, including brothers and sisters (whether by whole or half blood), spouse, ancestors, and

lineal descendants" shall be considered as "affiliated persons."  19 U.S.C. § 1677(33)(A).  Further,

Section 1677(33)(F) specifies that "[t]wo or more persons directly or indirectly controlling,

controlled by, or under common control with, any person" are also affiliated.  Id. at § 1677(33)(F).

Here, Commerce used these two provisions to conclude that the Doshi Companies were affiliated

through common control by the Doshi family, as an entity or "person."  Preliminary Affiliation

Memo at 4.   Because the affiliation statute does not directly speak to whether "person"

encompasses family groupings, the court will defer to a reasonable interpretation of the statute by

Commerce.  See Chevron, 467 U.S. at 842–43; Koyo Seiko I, 36 F.3d at 1573.

The court previously addressed Commerce's interpretation of the affiliation statute in

relation to families in Ferro Union v. United States.  44 F. Supp. 2d at 1326.  Ferro Union held that

Commerce may interpret a "family" as a "person" for purposes of Section 1677(33)(F) to establish

affiliation.   Id..  There, the court upheld Commerce's finding of affiliation among a series of

companies through common control of several families, even though there were no common

individuals in control of some of the affiliated companies.  Id. at 1320–21, 1326.  In its analysis,

the court noted that there is no statutory definition of "person" in Section 1677(33) or the general

definitions section of the URAA.  Id. at 1326.  Further, the court explained that Section 1677(33)

was amended by the URAA and its accompanying SAA, and that the SAA indicated an intent to

"permit a more sophisticated analysis [of affiliation] which better reflects the realities of the

marketplace" and to find control "through corporate or family grouping," to which Commerce's

interpretation of Section 1677(33)(F) gave effect.   Id. at 1323, 1326 (citing SAA at 838).

Furthermore, Commerce's regulations define "person" as "any interested party as well as any other

individual, enterprise, or entity, as appropriate."  19 C.F.R. § 351.102(b)(37).  The court in Ferro

Union concluded that considering a family as a "person" complied with Commerce's regulations

as "a family can reasonably be considered an 'entity' or an 'enterprise' because family members

likely share a common interest."  44 F. Supp. 2d at 1326.

The court agrees with the conclusion of Ferro Union and holds that Commerce permissibly

interpreted Section 1677(33) to include a family grouping as a "person" for purposes of affiliation.

See also Dongkuk Steel Mill, 29 CIT at 732 ("The court finds that Ferro Union's conclusion that Commerce's interpretation of section 1677[(33)](F) was reasonable under Chevron should not be disturbed because it complies with the statutory framework."); Zhaoqing New Zhongya Aluminum, 70 F. Supp. 3d at 1304 ("[T]he decision in Ferro Union Inc. supports the proposition that the singular person in the statute can be interpreted in the plural to facilitate statutory intent.").

Finally, the court is not persuaded by Echjay's argument that Commerce's inclusion of a family grouping as a person would leave subsection (A) redundant. See Pl.'s Br. at 6–8. Echjay claims that, because family members are defined as 'affiliates' in subsection (A), they cannot then be viewed as one person for purposes of subsection (F). Id. However, as explained, Commerce relied on both subsection (A) and subsection (F) to reach its conclusion that the Doshi Companies were affiliated. Preliminary Affiliation Memo at 4–5; IDM at 4–5, 18–19. In short, Commerce's determination did not render subsection (A) redundant. It is also not obvious that Commerce's interpretation of a "person" for the purposes of subsection (F) necessarily bears any implication on subsection (A) when the interpreted term "person" does not appear in subsection (A).

**B.      _Commerce's Determination that the Doshi Family Was a "Person" Under Section 1677(33)(F) Was Not Based on Substantial Evidence._**

Echjay also challenges Commerce's application of the affiliation statute to the Doshi family. Echjay disputes Commerce's determination by arguing that Commerce failed to "analyze [the] 'nature of the relationships among' the persons in a family, and justify its finding by substantial evidence." Pl.'s Br. at 9 (quoting Ferro Union, 44 F. Supp. 2d at 1320). Thus, Echjay contends that had Commerce analyzed the relationships among the Doshi family members, Commerce could not conclude based on substantial evidence that a family that has divided joint assets through hostile, legally binding separation agreements, constitutes a family that could commonly control the Doshi Companies. Id. at 10. The Government and Coalition respond that

Commerce's analysis under Section 1677(33)(A) supports the conclusion that Doshi family members are affiliated persons and thus constitute a "person" that controls the Doshi Companies under Section 1677(33)(F).  See Preliminary Affiliation Memo at 4–5; IDM at 20; Def.'s Br. at 11; Def.-Inter.'s Resp. to Ct.'s Questions for Oral Arg. at 1–2.

Commerce's determination that the Doshi Family constituted a "person," pursuant to a reasonable interpretation of the statute that a family grouping may be a "person," must also be based on substantial evidence.  See Fujitsu Gen. Ltd v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  Subsection (A) provides that "members of a family" are "affiliated persons," and thus Commerce correctly concluded that the owners of the Doshi Companies were affiliated persons as Echjay acknowledged that the Doshi Companies were each owned by members of the same Doshi family.  Echjay Questionnaire Resp. at 6–7; see also Ferro Union, 44 F. Supp. 2d at 1325 (holding that uncles and nephews would be included in the statute's definition of "family").  However, this conclusion alone does not support that a family grouping constitutes a "person" that may control multiple companies in accordance with Section 1677(33)(F).  On that point, Commerce's regulation implementing the affiliation statute provides further explanation.  The regulation states, "[i]n determining whether control over another person exists, within the meaning of section 771(33) of the Act, . . . [t]he Secretary will not find that control exists on the basis of these factors [, including family groupings,] unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product."  19 C.F.R. § 351.102(b)(3).  Further, Commerce defines a "person" to be "any interested party as well as any other individual, enterprise, or entity, as appropriate."  19 C.F.R. § 351.102(37).  Thus, in order to consider a family grouping to be a "person" capable of collective control, Commerce must also find that family grouping to share a

common interest or consist of relationships that could impact business decisions of family owned companies. See also Ferro Union, 44 F. Supp. 2d at 1326 ("Commerce concluded that anyone with the same surname was a member of the same family. On remand, Commerce should inform itself of the nature of the relationships among these people in order to assure itself that it has properly determined that the persons involved are family members as contemplated by the statute."). In this way, a family grouping could constitute an entity or person that controls related companies for purposes of affiliation under Section 1677(33)(F).

The court concludes that Commerce did not adequately explain that the Doshi family constitutes a person such that it collectively controlled the Doshi Companies and that those companies were affiliated in light of the record evidence. Echjay presented legal documentation showing hostile family partitions among the owners of the Doshi Companies, resulting in the splitting of family assets. IDM at 16; Echjay Questionnaire Resp. at 6–8. This legal separation prevents various Doshi family members from interfering in, controlling, or participating in the business of other family members. Echjay Questionnaire Resp. at 6–8. For this reason, Echjay argued that the owners of the Doshi Companies were not one family grouping, but several. Id. at 6–8. Commerce responded to this point by explaining: "the partition between shareholders of Echjay and Echjay Forgings has not been finalized. Moreover, the current family partition does not preclude cooperation among family members in the future [and] this ownership structure provides the family grouping the ability and financial incentive to coordinate their actions to act in concert with each other." IDM at 25. However, this explanation fails to address the Sarvadaman Doshi family relationship with the original Doshi family, whose assets were divided pursuant to a separation agreement from 1983. Further, that the transfer of shareholdings between Echjay and EFIPL had not been finalized, as Commerce alludes to, does not explain how the operative

separation agreements barring Echjay from interfering in or controlling EFIPL or Spire would not be effective.

Admittedly, the court in <u>Ferro Union</u> doubted whether Commerce should be required to distinguish families due to estranged family members, because "[n]either the statute, nor the regulations, provide for an exception to family for members who are estranged," and such a finding "would invite parties in administrative reviews to assert subjective criteria for determining familial relationships" and is thus "not administrable."  44 F. Supp. 2d at 1325.  However, the objective evidence of legal separation agreements that Echjay provided alleviates that concern here.  Thus, Commerce may not automatically find affiliated family members to be a person under subsection (F) but must instead address the evidence presented by Echjay.  Without fully examining and addressing the evidence of the family partitions, Commerce's finding that the Doshi family was a "person" capable of collectively controlling the Doshi Companies pursuant to Section 1677(33)(F) was not based on substantial evidence.  <u>See</u> <u>CS Wind Viet. Co. v. United States</u>, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (holding that the substantiality of evidence must account for anything in the record that reasonably detracts from its weight).

   II.    ***Commerce's Finding that EFIPL and Spire Would Not Require Substantial Retooling to Restructure Manufacturing, Exporting, and Selling Priorities Was Not Based on Substantial Evidence.***

As has been noted, with respect to the second prong required for collapsing entities, Commerce determined that the Doshi Companies "would require no substantial retooling in order to restructure manufacturing, exporting, and selling priorities" among themselves.  IDM at 24.  Commerce found that Echjay Industries satisfies the "no substantial retooling" requirement as it had a production facility and had exported subject merchandise to the United States before [[

   ]] the POI [[                                        ]].  Preliminary Affiliation Memo at 9.  While

Commerce did not find EFIPL to produce and sell subject merchandise at the time of the decision or during the POI, Commerce concluded that EFIPL satisfied the "no substantial retooling" requirement based on the evidence that it had produced and sold subject merchandise prior to the POI. Id. at 11. Although record evidence did not demonstrate that Spire exported subject merchandise to the United States at that time, Commerce found that Spire met the "no substantial retooling" requirement based on the evidence that Spire was a producer of identical products at the time of investigation and had sold subject merchandise in the past. Id. at 10. Commerce noted that Spire's website still listed stainless steel products, contrary to Echjay's claim that Spire had closed down its plant and Echjay's assurance that the website would be updated, which supported Commerce's finding that Spire was a producer of identical products. Id. In short, Commerce concluded that EFIPL and Spire were producers of subject merchandise based on their past production and thus met the "no substantial retooling" prong of Commerce's collapsing analysis.[6]

Echjay disputes the finding as to EFIPL and Spire, Pl.'s Br. at 24–29. Echjay argues that EFIPL and Spire were not producers of subject merchandise during the period of investigation. Pl.'s Br. at 24. It claims that Commerce did not consider the evidence it submitted showing that there were no production facilities at the original plant locations and no revenue from subject merchandise. Id. at 24–28. Echjay contends that Spire's website, relied on by Commerce, was outdated and Commerce's examination of the website fell outside of the POI. Id. at 27; Pl.'s Reply at 5. Echjay also suggests that Commerce could have visited the former manufacturing sites of

---

[6] Commerce may determine that collapsing affiliated non-producers is appropriate when there is "significant potential for the manipulation of price or production." Hontex Enters., Inc., v. United States, 28 CIT 1000, 342 F. Supp. 1225, 1231 (2004) ("Hontex Enters. II"). However, both the Government and the Coalition clarified that the Doshi Companies were collapsed as producers rather than non-producers. Def.'s Resps. to the Ct.'s Questions in Advance of Oral Arg. at 15; Def.-Inter.'s Resp. to Ct.'s Questions for Oral Arg. at 17.

EFIPL and Spire during its verification in India but instead made speculative claims about the two companies. Pl.'s Br. at 29; Pl.'s Reply at 5. Echjay concludes that there is no reason to find that EFIPL and Spire meet the "no substantial retooling" requirement simply because they have produced subject merchandise in the past. Pl.'s Br. at 24. The Government responds that Commerce's findings were based on substantial evidence because of evidence of their past production and Spire's website. Def.'s Br. at 13–15.

Commerce's determination that EFIPL and Spire would not require substantial retooling to shift manufacturing priorities towards the subject merchandise does not satisfy the court's review for substantial evidence. First, Commerce's finding that EFIPL satisfies the "no substantial retooling" requirement is supported only by the evidence that EFIPL produced subject merchandise prior to the POI. IDM at 23–24. The caselaw demonstrates a much higher bar for a substantial evidence showing that no substantial retooling is required. In Viraj Group v. United States, the Federal Circuit upheld Commerce's finding that no substantial retooling was required among collapsed companies. 476 F.3d at 1358–59. The court reviewed evidence provided by Commerce that the production facilities of one company could be retooled to make a product identical to that produced by the other companies, including the existing production facilities and the equipment to be added. Id. The court then confirmed Commerce's finding that the retooling would not be substantial based on the cost of retooling in relation to the company's historical capital expenditures and financial resources. Id. Similarly, in Slater Steels II, Commerce on remand referenced only the cost of retooling with company's financials to further support its determination that the retooling would not be "substantial." 316 F. Supp. 2d at 1378–80. There, the court ruled that a given cost of retooling, as a proportion of a company's fixed asset value, may not on its own qualify as "substantial." Id.

Commerce acknowledged that EFIPL did not produce subject merchandise during the POI and record evidence supported EFIPL's statement that it had closed its plants. IDM at 23–24. In light of these assertions, Commerce did not address whether EFIPL's facilities would require retooling to produce similar products to Echjay, nor how much retooling would be required. Echjay and EFIPL submitted photographs and design plans showing that EFIPL's manufacturing facilities were removed and there was ongoing construction to repurpose the site as a residential complex. See Echjay's Suppl. Questionnaire Resp. at 14–15. Given the record evidence, it is reasonable to conclude that, for EFIPL to shift production of subject merchandise, EFIPL would have to build the production facilities anew, incurring the upfront cost like any other new market entrant, costs that would likely be substantial. See also Slater Steels I, 279 F. Supp. 2d at 1376–77 (rejecting Commerce's finding of no substantial retooling where the affiliated companies did not have the production capability to produce the finished subject merchandise, only inputs). Commerce did not explain with sufficient clarity what linked its finding of EFIPL's past production to its conclusion that EFIPL satisfied the "no substantial retooling" requirement, and is thus not supported by substantial evidence. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43–44.

Second, with regard to Spire, Commerce relied on the record evidence that Spire's website continued to include products similar to the subject merchandise, in addition to evidence of past production. IDM at 24. Similar to EFIPL, Commerce acknowledged that the record evidence did not demonstrate that Spire exported subject merchandise at the time of investigation but noted that Spire had produced it in the past. Id. Commerce also concluded that the website information demonstrated that Spire was a producer of subject merchandise at the time of investigation, and that the website continued to list subject merchandise even after Echjay stated that it would be updated. Preliminary Affiliation Memo at 10; IDM at 24. Commerce did not explain how website

information adequately established Spire as a current producer, in light of other record evidence

showing that it no longer had production facilities.  Thus, Commerce's determination that Spire

satisfied the "no substantial retooling" requirement did not address important factors and evidence

raised by Echjay nor offer an adequate explanation of its conclusion in light of the record evidence.

See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001); Motor Vehicle Mfrs.

Ass'n, 463 U.S. at 43.

In sum, substantial evidence does not support Commerce's finding that EFIPL and Spire

would not require substantial retooling to restructure manufacturing, exporting and selling

priorities.[7]

### III.    *Commerce's Finding of the Significant Potential for Manipulation Was Not Based on Substantial Evidence.*

In determining the potential for manipulation -- the third prong of the collapsing decision

-- Commerce looks to the following factors: the level of common ownership, the extent to which

managerial employees or board members of one firm sit on the board of directors of an affiliated

firm, and intertwined operations.  19 C.F.R. § 351.401(f)(2).  Commerce considers the totality of

circumstances so that none of the factors above is dispositive of determining the potential for

---

[7] The court does not address the issue of the application of adverse inferences alluded to by Echjay, the Government, and Coalition in various filings.  While Echjay contested Commerce's finding of "non-cooperation and application of adverse facts available" in its complaint, Compl. ¶ 6, Echjay does not explicitly pursue its arguments on non-cooperation and adverse inference findings in the opening brief and thus waived such contentions.  See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").  Both the Government and the Coalition emphasize Echjay's failure in providing "complete and accurate responses" to Commerce's questions with regard to the other Doshi Companies.  Def.'s Resps. to the Ct.'s Questions in Advance of Oral Arg. at 13–14; Def.-Inter.'s Resp. to Ct.'s Questions for Oral Arg. at 14.  However, Commerce did not specifically apply an adverse inference to support its collapsing determination, and Commerce's discussion of adverse inferences occurred in separate sections in both the PDM and IDM.  See PDM at 9; IDM at 28–29.

manipulation. Koyo Seiko II, 31 CIT at 1535, 516 F. Supp. 2d at 1346. Here, Commerce found a significant potential for future manipulation among the Doshi Companies based on the level of common ownership and common board members or managers by the Doshi family collectively. IDM at 24–26. Commerce observed that the Doshi family owned and controlled the Doshi Companies, and therefore found common ownership among the Doshi Companies. Id. at 24–25. Commerce noted that the ownership structure provided the Doshi family the ability and financial incentive to coordinate and positioned the Doshi family to have significant influence over the production and sales decisions of each of the entities involved in the production and sales of subject merchandise. Id. at 25. Commerce determined that the fractured relationships within the Doshi family should not alter the finding because a current family partition does not preclude future cooperation. Id. Commerce then found overlap among the managerial employees or board members among the Doshi Companies, as "the Doshi family grouping serves as board members and directors" on each of the Doshi Companies. Id. Commerce also noted that one Doshi family member sat on the boards of both EFIPL and Spire. Id. at 26. Commerce concedes that the third factor of intertwined operations is not present but non-dispositive considering the totality of the circumstances. Id.

Echjay disputes Commerce's finding that there is a potential for manipulation among the Doshi companies because it rejects Commerce's conclusion that the Doshi family is properly considered one cohesive family grouping. Pl.'s Br. at 21–22. Echjay argues that there is no common ownership, as separate siblings and their spouses own separate companies and common family ownership alone is insufficient to support collapsing because it does not indicate common control. Id. Echjay also reports that no individual works in both Echjay and any of the other Doshi Companies and thus there are no shared managerial employees to support finding potential for

manipulation between Echjay and the rest of the Doshi Companies.  Id.  The Government contends that Commerce's finding was based on substantial evidence. Def.'s Br. at 15–18.  The Government argues that "[n]either the statute, nor the regulations, provide for an exception to family for members who are estranged."  Id. at 16 (quoting Ferro Union, 44 F. Supp. 2d at 1325).  The Government also emphasizes that Commerce considers the totality of circumstances in finding a significant potential for manipulation.  Id. at 17.  Coalition argues that Commerce's finding of a potential for manipulation correctly contributed to the totality of the circumstances and rejects the idea that a partition would preclude the ability or incentive to coordinate their future actions.  Def.-Inter.'s Br. at 27.

On the first factor, the court concludes that Commerce did not adequately explain its finding that there is a potential for manipulation depends upon the assumption that the Doshi family is a person or entity that acts as a cohesive unit.  For the reasons discussed above regarding affiliation, Commerce has not explained how this assumption is warranted based on the record evidence.  Therefore, Commerce's finding that there is a potential for manipulation among the Doshi Companies also fails to be supported by substantial evidence.

On the first factor, the court concludes that Commerce did not adequately explain its finding of common management among the Doshi Companies.  The court finds persuasive the conclusion of the court in a similar case, Jinko Solar Co. v. United States, 41 CIT __, __, 229 F. Supp. 3d 1333 (2017) ("Jinko I").  In that case, the court refused to affirm Commerce's conclusion that a family grouping's collective indicia of control supported a finding of common management.  Id. at 1344.  The court there noted that, while the affiliation statute leaves Commerce discretion to define "persons" broadly to include a "family," Commerce's regulation on common management has defined the inquiry much more narrowly "to require Commerce to compile a list of managers or board members on one firm and compare them to the board of directors of an affiliated firm."

Id. at 1344 n.12. The court in Jinko I held that, while "nothing precludes Commerce from considering that members of a family unit sit on the boards of two sets of entities as reflecting a potential for manipulation . . . if Commerce wishes to rely upon board memberships and management positions held by a family grouping, it must so state and explain how this factor creates a significant potential for the manipulation of price or production or reconsider its determination." Id. at 1345.

The court agrees with Jinko I and concludes that Commerce must explain why a different factor it relied upon justifies its finding of potential for manipulation. Here, Commerce provided the explanation that it "find[s] the Doshi family grouping to be a 'person' which owns and controls [the Doshi Companies], and as the Doshi family grouping serves as board members and directors of these companies, [Commerce] find[s] that there is overlap among the managerial employees or board members of the various companies, in accordance with 19 [C.F.R.] [§] 351.401(f)(2)(ii)." IDM at 25–26. Commerce must state that it relied upon the shared management through a family grouping to find potential for manipulation and explain how the evidence supports this conclusion. See Jinko I, 229 F. Supp. 3d at 1345. It would also need to address the partitions and hostility among the owners of the Doshi Companies raised by Echjay and explain whether the family relationships here are "beyond normal commercial considerations" and "out of common interest," as the court noted in Jinko Solar Co. v. United States, 41 CIT __, __, 279 F. Supp. 3d 1253, 1260 (2017) ("Jinko II"). [8] Commerce did not provide sufficient explanation on this point or any

---

[8] On remand, the court found Commerce satisfied this requirement after explaining "the enumerated and non-enumerated factors that it considered, and why each was relevant" in finding the potential for manipulation. Jinko Solar II, 279 F. Supp. 3d at 1260. Commerce clarified that the family as a whole played a prominent role in the management of the companies and the family relationship created potential "to make decisions based on considerations 'beyond normal commercial considerations' and 'out of common interest.'" Id. at 1260. The court confirmed

additional path to justify linking the Doshi Companies' management to the potential for

manipulation. Commerce's assertion -- that "the current family partition does not preclude

cooperation among family members in the future," IDM at 25 -- does not affirmatively support the

potential for manipulation; rather it is simply an argument that the possibility cannot be eliminated.

Therefore, Commerce's finding on shared management does not support its finding of potential

manipulation.

Regarding the common ownership factor, caselaw supports Commerce's finding of

common ownership by a family grouping to support finding significant potential for manipulation.

See Zhaoqing New Zhongya Aluminum, 70 F. Supp. 3d at 1304–05 (while "a different person

owns each of the three companies," the family grouping as a whole held controlling ownership in

all three companies and common ownership by the family was "a positive indicator of the

significant potential for manipulation"); Catfish Farmers of America v. United States, 33 CIT

1258, 1265, 641 F. Supp. 2d 1362, 1371 (2009) (affirming a finding of common ownership where

the family members were "the only shareholders, and the largest shareholders" in each of the

collapsed companies and thus concluded that the companies "have the ability or incentive to

coordinate their actions in order to direct the companies to act in concert with each other"). While

Commerce stated that the Doshi family in aggregate own a majority of the Doshi Companies,

which indicates the ability and financial incentive to coordinate and manipulate production and

sales, this conclusion requires the predicate analysis that the Doshi family is in fact an intact family

grouping. As noted above, however, Commerce did not address the partitions that included legal

separation agreements. Thus, while the Government is correct that there may not be an exception

---

Commerce's explanation noting that family relationships are indeed "beyond the scope of a normal
commercial relationship." Id. at 1260.

for estranged family members, Commerce still must provide a level of explanation of its decision that shows a rational connection between the facts found and its conclusion.  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  Commerce has not done so here.

As the Federal Circuit recently noted, "[w]hen Commerce promulgated 19 CFR § 351.401(f), it emphasized that collapsing requires a 'significant' potential for manipulation," not merely "any potential for price manipulation."  Prosperity Tieh, 965 F.3d at 1323 (quoting Preamble, 62 Fed. Reg. at 27,345) (emphasis original).  In sum, on remand Commerce must consider the record evidence of the family partition and also explain its impact on the potential for manipulation among the Doshi Companies.[9]

### IV.     Commerce's Decision to Collapse the Echjay and Echjay Industries Is Arbitrary and Capricious as it is Inconsistent with the Prior Decision Not to Collapse, But Not Inconsistent with the Concurrent CVD Decision Not to Find Cross-Ownership.

Finally, Echjay challenges Commerce's decision as inconsistent with (1) its prior decision not to collapse Echjay with Echjay Industries in Certain Forged Stainless Steel Flanges From India; Final Results of Antidumping Duty Administrative Review, 71 Fed. Reg. 29,314 (Dep't Commerce May 22, 2006) ("Flanges 2006"); and (2) its determination that there is no cross-ownership between Echjay, Echjay Industries, and Spire in the concurrent CVD investigation, Stainless Steel Flanges from India: Final Affirmative Countervailing Duty Determination and

---

[9] Echjay suggests that, under the statutory scheme, Commerce should deal with any future manipulation retroactively through the annual administrative review process, rather than speculating about future manipulation in the original AD investigation.  Pl.'s Br. at 32–33; Pl.'s Reply at 6–7.  The Government argues that Commerce's practice is to consider both actual, past manipulation and the potential for future manipulation in its investigation, rather than to examine manipulation retroactively.   Def.'s Br. at 17 (citing Preamble, 62 Fed. Reg. at 27,346).  Commerce's practice to consider both current and future manipulation in the initial investigation complies with the § 351.401(f) regulation and does not clearly contradict with the overall purpose of the AD statute to determine margins as accurately as possible.  See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013).

Final Affirmative Determination of Critical Circumstances, 83 Fed. Reg. 40,748, and

accompanying Issues and Decision Mem. C-533-878 ("Flanges CVD IDM").  Pl.'s Br. at 30–31,

33.  The court concludes that on remand Commerce must address and explain any inconsistency

with its Flanges 2006 determination.

### A.    Inconsistency with *Flanges 2006*

Echjay argues that, in its 2006 AD investigation into the same subject merchandise,

Commerce determined not to collapse Echjay and Echjay Industries because a significant potential

for manipulation did not exist.  Pl.'s Br. at 31 (citing Flanges 2006).  Echjay argued to Commerce

and here that there was no factual change in the relationship of Echjay and Echjay Industries with

regard to company ownership or management, but that Commerce's treatment of this relationship

did change.  Echjay Case Br. at 6–7; Pl.'s Br. at 31; Pl.'s Reply at 8.  Thus, Echjay argues that

Commerce's determination to collapse the entities in this investigation was "unlawful."  Pl.'s Br.

at 30.

The Government counters that Flanges 2006 is not controlling because "each proceeding

and segment of proceeding stands its own record."  Def.'s Br. at 18 (citing Peer Bearing Co.-

Changshan v. United States, 32 CIT 1307, 1310, 587 F. Supp. 2d 1319, 1325 (2008)).  Coalition

also contends that Echjay bears the burden of building the record in each investigation.  Def.-

Inter.'s Br. at 22.  The Government and Coalition each characterize the inconsistency claim in the

current case as regarding a factual determination, which Commerce has substantial discretion over,

rather than a legal determination.  Def.'s Resps. to the Ct.'s Questions in Advance of Oral Arg. at

17–18; Def.-Inter.'s Resp. to Ct.'s Questions for Oral Arg. at 19–20.  Facts also changed, the

Government suggests: Commerce found Echjay and Echjay Industries did not meet the "no

substantial retooling" requirement in Flanges 2006, but that it did in this investigation because

both companies produced and sold subject merchandise during the POI.  Def.'s Br. at 19.  The

Government also claims EFIPL and Spire, created after the investigation of <u>Flanges 2006</u>, to be

new factual elements, <u>id.</u>, though Echjay claims the two companies are irrelevant for the

consistency argument, Pl.'s Reply at 7.  The Government concludes that the facts above render the

current determination "fundamentally different" from <u>Flanges 2006</u> and thus is not inconsistent.

Def.'s Br. at 19.

"[C]onsistency has long been a core interest of administrative law, and inconsistent

treatment is inherently significant."  <u>DAK Americas LLC v. United States</u>, 44 CIT __, __, Slip

Op. 20-80 at 18 (June 4, 2020) (citing <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944);

<u>Chisholm v. Def. Logistics Agency</u>, 656 F.2d 42, 47 (3d Cir. 1981)).  "[W]here an agency departs

from prior determinations, it is appropriate to compel the agency to explain whether: (1) good

reasons prompt that departure; or (2) the prior determinations are inapposite such that it is not in

fact a departure at all."  <u>Id.</u> at 20.  Though Commerce may enjoy wide latitude in its application of

the AD and CVD statute and prior determinations are not legally binding in same way as case law

through stare decisis, <u>DAK Americas</u>, Slip Op. 20-80 at 18–19, nn. 9–10 (citations omitted), its

discretion is limited by the need to provide an adequate explanation for any deviation from its past

practice and interpretations.  <u>SKF USA Inc.</u>, 263 F.3d at 1382 ("[A]n agency action is arbitrary

when the agency offer[s] insufficient reasons for treating similar situations differently.").

Commerce's explanation of its different determinations regarding the same entities does

not meet the stated standard.  In its 2006 investigation, Commerce found Echjay and Echjay

Industries to be affiliated but decided not to collapse them based on the findings that 1) Echjay and

Echjay Industries had production facilities that would require substantial retooling to restructure

manufacturing priorities, and 2) Echjay and Echjay Industries had no significant potential for

manipulation.  Certain Forged Stainless Steel Flanges From India; Preliminary Results of

Antidumping Duty Administrative Review, 71 Fed. Reg. 11,379, 11,383 (Dep't Commerce Mar.7,

2006).  Here, Commerce departed from Flanges 2006 regarding the second two collapsing prongs.

See IDM at 24–25.  Echjay did not dispute Commerce's departure on the finding regarding the "no

substantial retooling" requirement but challenged its departure of the finding of potential for

manipulation.  Echjay Case Br. at 6–7; Pl.'s Br. at 30–32.  Echjay argued to Commerce that the

same relationship between Echjay and Echjay Industries that led Commerce to conclude there was

no potential for manipulation in Flanges 2006 was unchanged in this investigation.  Echjay Case

Br. at 7.  Commerce neither met the burden to "reasonably address" Echjay's challenge or the

requirement that it sufficiently distinguish its past decisions.  Commerce discussed the relevance

of Flanges 2006 only with reference to the determination on the "no substantial retooling

requirement," which Echjay did not dispute, and did not mention how Flanges 2006 impacts its

decision as to the potential for manipulation.  IDM at 23–27; Preliminary Affiliation Memo at 9–

12.  Contrary to the Government's assertion, the addition of EFIPL and Spire does not facially

concern the relationship between Echjay and Echjay Industries, and the Government provided no

additional justification for why it should.  See Def.'s Br. at 19.  Commerce did not distinguish the

relevant facts that would otherwise support a differential finding in this case from Flanges 2006

and failed to provide good reasons that prompted the departure in this case.  Therefore, this aspect

of its decision is arbitrary and capricious, and Commerce must explain any inconsistency on

remand. See SKF USA Inc., 263 F.3d at 1382.[10]

_____

[10] The Government cites Peer Bearing Co.-Changshan, 587 F. Supp. 2d at 1325, and Shandong
Huarong Machinery Co. v. United States, 29 CIT 484, 491, in support of its contention that each
proceeding and segment of proceeding stands its own record" and that Flanges 2006 is not
controlling in this case.  Def.'s Br. at 18.  Both of the cases cited address a scenario in which the
investigated parties failed to establish an adequate record for Commerce's administrative review

### B. Inconsistency with Concurrent CVD Determination

Echjay also challenges Commerce's decision to collapse as inconsistent with the lack of finding cross-ownership in the CVD investigation. Pl.'s Br. at 33. Commerce determined that Echjay, Echjay Industries, and Spire are collapsed but not cross-owned. In the CVD determination, Commerce found Echjay to be cross-owned with EFIPL, but it did not mention Echjay Industries or Spire. Mem. from J. Maeder to G. Taverman, re: Decision Mem. for the Preliminary Determination in the Countervailing Duty Investigation of Stainless Steel Flanges from India (Dep't Commerce Jan. 16, 2018) (West) ("Flanges CVD PDM"); Flanges CVD IDM.[11] Notably, Commerce found cross-ownership "because of the substantial ownership positions held by family members." Flanges CVD PDM. Echjay argues that collapsing determinations in AD investigations and cross-ownership determinations in CVD investigations have the same goal -- to avoid manipulation of trade laws and prevent companies from selling through its affiliates with a lower duty margin. Pl.'s Br. at 33. Thus, Echjay argues that the different determinations regarding collapsing and cross-ownership in these investigations was "unlawful." Pl.'s Br. at 33.

The Government and Coalition explain that these two determinations serve different purposes and are governed by different regulations. Def.'s Br. at 19–21; Def.-Inter.'s Br. at 28. The court agrees with the Government and Coalition's argument that the cross-ownership determination in CVD investigations bears no weight on the finding of collapsing in Echjay's AD

---

and held that the investigated parties could not rely on the record in previous investigations or administrative reviews. Peer Bearing Co.-Changshan, 587 F. Supp. 2d at 1324–25; Shandong Huarong Mach. Co., 29 CIT at 490–91. Here, Echjay did not rely on the record in Flanges 2006 to establish its claim but provided record evidence indicating the same factual situation. See Echjay Case Br. at 7.

[11] Neither memoranda are on the record for this case but are otherwise available to the court through submission in another case (IDM), see Bebitz Flanges Works Pvt. Ltd. v. United States, 44 CIT _, 433 F. Supp. 3d 1297 (2020), and open database (PDM and IDM).

investigation.  The collapsing decision in AD investigations is governed by 19 C.F.R. § 351.401(f),

while the cross-ownership finding in CVD investigations is determined by 19 C.F.R. §

351.525(b)(6).   Cross-ownership is found "between two or more corporations where one

corporation can use or direct the individual assets of the other corporation(s) in essentially the

same ways it can use its own assets."  19 C.F.R. § 351.525(b)(6)(vi); see Fabrique de Fer de

Charleroi v. United States, 25 CIT 567, 166 F. Supp. 2d 593, 600–04 (2001).  The standard is

normally met when "there is a majority voting ownership interest between two corporations or

through common ownership of two (or more) corporations."   19 C.F.R. § 351.525(b)(6)(vi).

"Different standards applied to the same facts may reasonably lead to different outcomes.  Thus,

there is no inconsistency between Commerce's decision to treat the companies as a single entity

in the [AD] proceeding but not in the CVD investigation."  Zhaoqing New Zhongya Aluminum

Co., 70 F. Supp. 3d at 1307.  Lastly, Commerce made positive determinations in both collapsing

and cross-ownership between Echjay and EFIPL and did not address the cross-ownership issue

regarding Echjay Industries and Spire.  Even if the court were to accept Echjay's interpretation,

Commerce's decisions contained no facially inconsistent analyses or reasoning that could support

remanding the AD collapsing determinations as to Echjay Industries and Spire.  Therefore, the

court dismisses Echjay's claim as to inconsistency between the AD and CVD investigations.

## CONCLUSION

The Final Determination is remanded to Commerce for further proceedings consistent with

this opinion.  On remand, Commerce should explain based on the record evidence why the Doshi

family should be viewed as a "person" within Section 1677(33)(F), why EFIPL and Spire would

not require substantial retooling in light of the evidence raised by Echjay, why there is a potential

for manipulation between the Doshi Companies, and address any inconsistency with its Flanges

Court No. 18-00230                                                                    Page 37
*PUBLIC VERSION*

2006.  Commerce shall file with this court and provide to the parties its remand results within 90

days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing

the revised final determination to the court, and the parties shall have 15 days thereafter to file

reply briefs with the court.

       **SO ORDERED.**

                                               /s/ *Gary S. Katzmann*
                                           Gary S. Katzmann, Judge

Dated: October 8, 2020
       New York, New York